```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,
```

|||
|---|---|
| | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: _6/24/2024_ |

-against-

KARREM NASR,

                Defendant.

24 Cr. 19 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Defendant, Karrem Nasr, is charged with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B, 3238, and 2. Indictment, ECF No. 6. On December 29, 2023, the Honorable Barbara C. Moses ordered Nasr detained pending trial. ECF No. 5. Defendant now moves for release on bail or for a hearing on the matter. Def. Mem., ECF No. 17. For the reasons stated below, Defendant's motion is DENIED.

## BACKGROUND

    Nasr, a United States citizen, traveled to Egypt in July 2023 to visit family and study Arabic. Compl. ¶¶ 1, 7(b)(i), ECF No. 1. While there, in November 2023, he began messaging with an FBI confidential source (the "CS") who, "at the direction of law enforcement, was posing as a facilitator for terrorist organizations." *Id.* ¶ 3. The two exchanged messages about extremist ideologies, and Nasr shared a link to his X (formerly Twitter) account, on which he expressed his desire to engage in terrorist activity targeting the United States. *Id.* ¶ 7(g). Nasr also informed the CS that he wanted to make "hijrah"[1] to Somalia to join the al Shabaab terrorist organization, and asked the CS about potential "options other than Somalia, and for advice about

---

[1] Hijrah is an "Arabic term normally used to refer to migration, but which is often used by those with extremist views to describe a foreign fighter's journey abroad to wage jihad." Compl. ¶ 7(b)(ii) n.5.

the most suitable option." *Id.* ¶¶ 7(b)(ii)–(iv), 8(a)–(d).  Nasr indicated to the CS that he was willing to write, translate, and "shoot" for the organization. *Id.* ¶ (7)(b)(ii).  Later that month, he discussed with the CS how he could reach al Shabaab in Somalia without law enforcement detection. *Id.* ¶ 9(b)–(g).  Nasr booked a one-way flight from Egypt to Nairobi, Kenya for January 11, 2024, and took a screenshot of a reservation for a flight from Nairobi to New York, which he never purchased but intended to use as cover to avoid interdiction. *Id.*  From Kenya, he would be "smuggled to the al Shabaab camp." *Id* ¶ 9(a)(i).

In the weeks before his flight, Nasr purchased boots for al Shabaab's military-like training. *Id.* ¶ 9(k).  And, on December 9, 2023, he told the CS that his mother was traveling to Egypt and that she wanted Nasr to return with her to the United States. *Id.* ¶ 9(g), (h).  To avoid the "problem" of his mother's arrival in Egypt, *id.* ¶ 9(g), Nasr flew to Kenya earlier than initially planned. *Id.* ¶ 9(*l*).  Upon arrival, on December 14, 2023, he was taken into custody by Kenyan authorities. *Id.*

That same day, by sealed complaint, the Government sought an arrest warrant for Nasr. *See generally* Compl.  On December 29, 2023, he appeared before Judge Moses and was ordered detained.  ECF No. 5.  Judge Moses found that Nasr had taken "a series of carefully planned and organized steps" to carry out his goal of joining al Shabaab, including traveling from Egypt to Kenya, purchasing supplies, and "making [his] travel arrangements in such a way that [his] true motive would be undetect[ed]" by law enforcement.  ECF No. 13 at 45:7–16.  On January 11, 2024, a Manhattan grand jury returned an indictment charging Nasr with attempted provision of material support and resources to a designated foreign terrorist organization. *See* Indictment.

Nasr now moves for bail pending trial and proposes the following conditions:

> home incarceration in the home of his mother (who can serve as a Court-appointed third-party custodian), subject to ongoing monitoring of his

>electronic communications, and enroll[ment] in mental health treatment, all enforced by a $250,000 personal recognizance bond co-signed by five financially responsible persons, including immediate family members for additional moral suasion.

Def. Mem. at 1.

## LEGAL STANDARD

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, requires the Court to release a defendant pending trial subject to the least restrictive conditions that will reasonably assure the defendant's appearance as required and the safety of any other person and the community. 18 U.S.C. § 3142(c)(1)(B). The Court may order that a defendant be held without bail only if there are no conditions that will reasonably assure the defendant's appearance and the safety of any other person and the community, after considering the factors set forth in 18 U.S.C. § 3142(g). Those factors are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, financial resources, length of residence in the community, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *Id.* § 3142(g).

The Government typically bears the burden of establishing that evidence supports pretrial detention. However, when a defendant is charged with a terrorism crime, a presumption arises that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Id.* § 3142(e)(3)(C). This presumption is rebuttable. *Id.* § 3142(e)(3). To do so, a defendant must "com[e] forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011). "Satisfying th[is] burden of production does not eliminate the presumption favoring detention; it remains a factor to be considered among those weighed by the district court." *Id.*

3

(cleaned up).  Yet, "[a]t all times, [] the [G]overnment retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community, and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *Id.* (cleaned up).

## DISCUSSION

Guided by the factors enumerated in 18 U.S.C. § 3142(g), the Court finds that the Government has met its burden of persuasion.  These factors indicate that Nasr remains a danger to the community and a risk of flight.

I. <u>Nature and Circumstances of the Charged Offense</u>

First, there is no disputing the seriousness of the charges against Nasr.  Nasr is charged with attempting to "join and receive military training from al Shabaab."  Compl. ¶ 5.  "The United States Secretary of State [] designated al-Shabaab as a foreign terrorist organization in February 2008; in 2012, al-Shabaab swore allegiance to and merged with al-Qaeda."  *United States v. Jones*, 100 F.4th 103, 106 (2d Cir. 2024).  The Circuit has recognized the "extraordinarily violent and sectarian nature of al-Shabaab's terrorism."  *Id.* at 112.  The fact that Nasr was interdicted before he could reach the al Shabaab training camp does not negate his alleged intention to join the organization and the concrete steps he took in attempting to do so.  Further, the potentially long sentence he faces for this offense supports a finding that Nasr poses a flight risk.  *See* Gov. Opp. at 10–11.

Nasr points to *United States v. Hossain* as precedent for granting bail to a defendant charged with terrorism-related offenses.  Def. Mem. at 10 (citing Bail Hr'g Tr., No. 19 Cr. 606 (S.D.N.Y. July 13, 2020), ECF No. 64).  He argues that his case "presents far fewer aggravating factors than the facts of *Hossain*."  *Id.* at 11.  The Court finds *Hossain* inapposite.  The summer

2020 bail decision in *Hossain* was premised on the compounding effect of several distinguishable facts: (1) the appointment of new counsel less than five months before trial; (2) the Metropolitan Correctional Center's virtual lockdown, which significantly limited the defendant's ability to work with counsel; and (3) the "unusual" fact that the defendant needed to review "500 hours of tapes," but could not do so due to inadequate computer access and the closure of the facility's library.  Bail Hr'g Tr. at 31:19–33:16, *Hossain*, No. 19 Cr. 606. Likewise, the Court finds distinguishable the recent bail decision in *United States v. Salman*, which Nasr cites in his reply.  *See* Def. Reply, ECF No. 25 (citing Bail Hr'g Tr., No. 24 Cr. 206 (E.D.N.Y. May 15, 2024), ECF No. 23).  Most critically, differing from the instant matter, the Government in *Salman* provided "no indication that [the defendant] . . . expressed [extremist] sentiment," and uncertainties remained as to the defendant's "agency"—as a woman living in an ISIS-controlled territory in Syria—in the alleged terrorism-related conduct.  Bail Hr'g Tr. at 51:12–52:17, 55:4–9, *Salman*, No. 24 Cr. 206.

Therefore, the nature and circumstances of the charged offense weigh in favor of continued detention.

II.     Weight of the Evidence Against the Defendant

Next, there is significant evidence of Nasr's alignment with extremist ideologies and his efforts to join al Shabaab.  *See* Compl.  His communications with the CS in late 2023 evince his desire to engage in terrorist activity.  *See id.* ¶ 7.  Further, Nasr's interest in extremism predates the circumstances leading to the instant offense.  In March 2022—more than a year before he connected with the CS—Nasr messaged on social media with a user he believed could "teach [him] more about jihad."  Gov. Opp. at 6, ECF No. 22.  Nasr remarked, "I wish I could be a m[uj]ahid," a term "that refers to a person who engages in jihad."  *Id.* at 6 & n.7.  In the months

5

between these messages and his arrest, Nasr engaged with others on social media about how to "join the Afghan Taliban" and the best routes for joining terrorist groups such as al Shabaab. *Id.* On X, Nasr posted about his desire to target the United States. Compl. ¶ 7(g). In one tweet, he wrote about jihad "[c]oming soon to a US location near you" followed by a plane, bomb, and flame emoji. *Id.* ¶¶ 4, 7(g). In another, he reposted a video of an al-Qaeda camp. *Id* ¶ 7(g). Finally, in post-arrest statements, Nasr continued to "characterize[] America as evil and reiterated his motivation to take action." Gov. Opp. at 9. Based on this evidence, this factor also weighs in favor of continued detention.

   III.   History and Characteristics of the Defendant

Nasr is twenty-three years old and a dual citizen of the United States and Egypt. Gov. Opp. at 10. He was diagnosed with Autism Spectrum Disorder ("ASD") at age three and has since been diagnosed with "cooccurring disorders common in individuals with ASD," including "impulse control issues," "Attention Deficit Hyperactivity Disorder (ADHD)," "weight gain," and "depression." Def. Mem. at 1–3. Nasr argues that his "ASD-influenced predisposition for developing fixations" explain how in the wake of the "events of October 7, 2023[,] in Israel and Gaza" and "public appeals to defend besieged Muslims," he was compelled to communicate with others online about "Islamic extremism." *Id*. at 4. He contends that his "simplistic and underdeveloped socialization" has been misinterpreted as "a desire to join a foreign terrorist organization." *Id.* The Court is not persuaded. Nasr has demonstrated a degree of savvy that belies this argument. He "worked for several years in tech installations at Best Buy, attended Rutgers University, recorded a podcast, [and] operated a copywriting business." Gov. Opp. at 12. The conduct alleged in the complaint also demonstrates his capacity to devise and carry out a plan to evade law enforcement and conceal his online activity and plans from his family.

6

Nasr's immediate family lives in New Jersey.  Def. Mem. at 4.  Nasr proposes "home incarceration in the home of his mother (who can serve as a Court-appointed third-party custodian) . . . enforced by a $250,000 personal recognizance bond co-signed by five financially responsible persons, including immediate family members."  *Id.* at 1.  Nasr argues that the "moral suasion" of his immediate family counsels in favor of bail.  *Id.*  However, as the Government states, "Nasr was living at home with his family when he first began adopting a radical jihadist ideology and reaching out to others who share the same view, and when he began inquiring about waging jihad and studying with radical clerics."  Gov. Opp. at 12.  The Court agrees.  As Judge Moses noted, despite his family's "best intentions" and their "best [efforts] to ensure [Nasr] abide by" the imposed bail conditions, such conditions are "far from foolproof."  ECF No. 13 at 45:17–24.

Considering his extensive family ties abroad, Egyptian citizenship, and the limited moral suasion of his family, the Court finds that Nasr's history and characteristics weigh in favor of continued pretrial detention.

IV.    Potential Danger to the Community

Finally, Nasr claims that his "impairment[s], [] lack of any history of criminal conduct or violence," and the dearth of allegations that he "ever presented any actual risk of danger" support a finding that he does not pose a danger to the community.  Def. Mem. at 10.  He also contends that "given his size and impaired functioning, it is unfathomable that [he] would be able to make it far beyond his driveway even if he attempted to flee."  *Id.* at 8.  Based on Nasr's demeanor in court proceedings thus far, the Court disagrees with this characterization.  GPS monitoring, which Nasr proposes, would be inadequate, as ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee.  *See* Tr. at 5:4–6, *United States v. Freeman*,

No. 21 Cr. 88 (S.D.N.Y. Oct. 5, 2021), ECF No. 50 ("Anyone who knows the technology of electronic monitoring knows that it is far from foolproof."); *United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (stating that electronic monitoring "at best . . . limits a fleeing defendant's head start").  As Nasr has expressed, and not disavowed, his desire to target the United States, the Court finds that the proposed bail conditions would not adequately protect the community should he seek to act on this desire.  Accordingly, this factor weighs in favor of continued detention.

## CONCLUSION

The Court finds that no condition or set of conditions would ensure Defendant's return to court or the safety of the community.  For these reasons, Defendant's motion for release on bail pending trial is DENIED.  The Clerk of Court is directed to terminate the motion at ECF No. 17.

SO ORDERED.

Dated: June 24, 2024
New York, New York

_____
ANALISA TORRES
United States District Judge