UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

KARREM NASR,
      a/k/a "Ghareeb Al-Muhajir,"

              Defendant.

24 Cr. 19 (AT)


**GOVERNMENT'S SENTENCING SUBMISSION**


JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278


Camille L. Fletcher
Kimberly Ravener
Stephen Ritchin
Assistant United States Attorneys
    *- Of Counsel -*

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the June 30, 2025 sentencing of Karrem Nasr, a/k/a "Ghareeb Al-Muhajir." For the reasons set forth below, the Government respectfully submits that a sentence of at least 15 years' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Nasr is a New Jersey-born dual United States and Egyptian citizen who devoted himself to radical jihad and who aspired to martyrdom for the jihadi cause. In conversations with a Federal Bureau of Investigation ("FBI") confidential source (the "CS"), Nasr repeatedly and chilling stated that he was prepared to become a jihadi and to kill and injure others, and to be killed, injured, or captured. He revealed his hatred and contempt for the United States in communications with the CS and, independently of the CS, in frequent social media posts invoking al Qaeda to threaten violence against Americans. Nasr believed that America was "evil," the "head of the snake," and the number one enemy of Muslims. The murderous October 7, 2023 terrorist attack by Hamas spurred Nasr into action. To fulfill his jihadist aspirations and to join the terrorist fight against America and its allies, Nasr flew to Kenya to join the foreign terrorist organization al Shabaab, knowing that it used brutal violence to harm both civilians and American interests.

The United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") call for a sentence of 20 years' imprisonment, which would be appropriate in light of the serious nature of the defendant's terrorism offense. Against this backdrop, and while taking into account certain personal characteristics of the defendant claimed by the defense, the Government respectfully submits that a sentence of at least 15 years' imprisonment is necessary and appropriate to reflect the extremely serious nature of the defendant's offense, to provide just punishment for his conduct, to deter and prevent the defendant from resuming his activities in support of radical Islamic

2

terrorist ideology, and to deter others who, like the defendant, seek to join, serve, and kill on behalf of brutal terrorist organizations like al Shabaab.

In the face of this deeply disturbing conduct, Nasr seeks a drastic downward variance based largely on his youth, reported history of mental health issues, and claimed neurodevelopmental condition. (Defendant's Sentencing Letter, dated Jun 9, 2025, ("Def. Ltr.") at 2-4). Nasr asks this Court to vary downward by 17 years from his 20-year Guidelines sentence—an 85% reduction—to a sentence of only three years, and thus release him back into the American community in little more than a year (assuming he receives so-called good-time credit), when he will be 25 years old. *Id.* at 2; PSR at 1. But Nasr's challenges do not justify the extraordinary leniency he seeks. Those challenges did not prevent Nasr from committing a terrorism offense or from harboring alarming antipathy toward the country where he was born and raised; nor do they mitigate the danger he continues to pose to the community. Contrary to the defense's characterizations, Nasr took the initiative to wage jihad, expedited his attempt to join al Shabaab, carefully planned cover stories and subterfuge to evade law enforcement and to evade his own family, and when he was arrested, chillingly reaffirmed his intent to die for the jihadist cause.

The Government respectfully submits that any sentence of less than 15 years, let alone a three-year sentence, would be wholly inappropriate and pose a serious danger to the community. Nasr planned to join, train, and kill with al Shabaab and took concrete steps to perfect and carry out his plan. He was specifically inspired by monstrous and meticulously premeditated terrorist attacks, including the September 11, 2001 attacks by al Qaeda in the United States, and Hamas' October 7, 2023 attacks in Israel. This is extremely serious and disturbing conduct. Ultimately, Nasr fails to present a compelling justification counseling against the imposition of a substantial sentence of imprisonment. Accounting for the seriousness of Nasr's offense, the need to provide

just punishment for it, the need to protect the public, and the need to provide adequate specific and general deterrence for aspiring terrorists such as Nasr, the facts here militate strongly in favor of a sentence of no less than 15 years imprisonment.

## RELEVANT BACKGROUND

### I.    The Offense Conduct

#### A.  Background on Al Shabaab

Al Shabaab is an al Qaeda-affiliated foreign terrorist organization based in east Africa. After years of political instability in Somalia, al Shabaab was formed in 2004 by a group of violent Islamist insurgents who fought against the newly formed Somali government and took control of much of southern Somalia.  PSR ¶ 13.  Like other terrorist organizations such as al Qaeda, al Shabaab has an organized command and control structure and uses violence to achieve its goals. *Id.* ¶¶ 14, 18.  Al Shabaab has declared that its ultimate goal is the imposition of Sharia, *i.e.*, Islamic law, throughout Somalia and its leadership has called for foreign fighters to join al Shabaab in Somalia in its "holy war" against the international forces in Somalia.  *Id.* ¶¶ 14-15.  This call for foreign fighters was echoed by al Qaeda's leadership, including Usama bin Laden.  *Id.* ¶ 15.  As a result, al Shabaab's recruitment efforts, men from other countries, including the United States, have traveled to Somalia to engage in violent jihad.  *Id.* ¶ 15.  In 2008, the U.S. Secretary of State designated al Shabaab as a foreign terrorist organization.  *Id.* ¶ 16.  In 2012, al Shabaab merged with al Qaeda.  *Id.* ¶ 18.

Since its designation, al Shabaab has repeatedly publicly declared its intent to harm the United States and has acted on those deadly ambitions.  *Id.* ¶ 17.  And in conducting terrorist operations, al Shabaab has focused on targeting Americans, including at locations in Somalia, Kenya, and the United States.  *Id.* ¶ 19.  For example, in or about May 2008, al Shabaab declared that its fighters would hunt the U.S. government and that governments supporting the United States

and Ethiopia should keep their citizens out of Somalia. *Id.* ¶ 17. In or about April 2009, al Shabaab declared that it was responsible for mortar attacks against a U. S. Congressman who had been visiting Somalia. *Id.* In July 2010, al Shabaab claimed responsibility for the suicide bombing in Kampala, Uganda that killed approximately 74 people, including an American citizen; in September 2013, al Shabaab claimed responsibility for an attack on a shopping mall in Nairobi, Kenya that killed approximately 72 people and wounded at least 175, including American citizens; and in February 2015, in an online video al Shabaab encouraged its followers to conduct attacks in shopping malls in, among other places, the United States. *Id.* ¶ 19.

On May 5, 2017, after a member of the U.S. military was killed and two others were hurt while assisting the Somali National Army, al Shabaab announced that it had "foiled a landing operation by Crusader U.S. Special Forces, and [it] managed to kill and wound a number of [] soldiers, and capture weapons and military gear as war spoils." PSR ¶ 20. The following day, al Shabaab released 21 photographs depicting captured U.S. military equipment including electronics, gloves, boots, medical equipment, and an American flag patch. *Id.* A few months later, in September 2017, al Shabaab's leader praised attacks on U.S. forces. *Id.* ¶ 21. In July 2019, al Shabaab claimed responsibility for a suicide bombing at the office of the mayor of Mogadishu, Somalia. *Id.* ¶ 22. Al Shabaab claimed that the target of the suicide bomber was the newly appointed United Nations envoy to Somalia, who was a U.S. national. *Id.*

Al Shabaab's ambitions for terrorist attacks are not confined to East Africa. Al Shabaab has also planned attacks in the United States. For example, on November 4, 2024, Cholo Abdi Abdullah, was convicted at trial for his role in an al Shabaab plot to hijack commercial aircraft and crash them into a building in the United States, an attempt to emulate al Qaeda's September 11, 2001 attack on the World Trade Center. *Id.* ¶ 23.

In addition to attacking Americans and American interests, al Shabaab has also assassinated Somali civilians and journalists, and used improvised explosive devices, rockets, mortars, and automatic weapons to undermine the Somali government, to repress the Somali people, and to force withdrawals of foreign troops. *Id.* ¶ 14. Al Shabaab has claimed responsibility for multiple suicide bombing attacks, including attacks against Burundian peacekeepers in April 2008 and February 2009, and five simultaneous suicide bombings targeting Somali government, Ethiopian, and United Nations facilities in October 2008. *Id.* And Al Shabaab's brutality was clearly on display in late 2008 when it disseminated a videotape of the slow decapitation of an accused spy. *Id.*

### B. Nasr Seeks Radical Jihad

Nasr's radicalization occurred over the course of years prior to his attempt to join al Shabaab. He began expressing his support for jihadi fighters by at least June 2021. In a text message with friends on June 1, 2021, Nasr wrote: "Saad: posts a picture of a lgbt parade in a Muslim chat *no one bats an eye*. Karrem: posts a picture of the mujihadeen that protected Afghanistan from the atheist USSR *gets booted*." PSR ¶ 56.

Beginning no later than March 2022, Nasr's commitment to a violent jihadist ideology escalated from posting and consuming content online to actively trying to connect with others who shared the same intentions in order to study jihad and become a fighter himself. *Id.* ¶ 57. For example, on March 25, 2022, in a direct message to an Instagram user ("Instagram User-1"), Nasr wrote, "I found your IG from a brother on telegram. He told me you can teach me more about jihad," and he also wrote, "I wish I could be a mjuahid." *Id.* ¶ 58. Two months later, on May 18, 2022, Nasr messaged a different person on Instagram ("Instagram User-2") the following: "[A] brother from telegram told me about you[,] he said you can teach me about jihad." *Id.* ¶ 59.

Nasr also discussed radical jihadi content with others on Instagram and inquired about how

he could connect directly with a radical cleric.  For instance, on May 29, 2022, Nasr asked Instagram User-1, "Can you recommend some scholars for me? I currently listen to ahmed musa Jibril a lot."  *Id.* ¶ 60.  Nasr apparently was referring to Ahmad Musa Jibril, *id.* at 18 n.7, an Arab-American extremist Islamic preacher who, according to one report, was followed by 60 percent of the foreign fighters in Syria.[1]  About a week later, on June 6, 2022, Nasr messaged another Instagram user ("Instagram User-3"), "Do you know how I can study with sh[eik] ahmed musa jibril?"  Nasr also wrote to Instagram User-2 that he "loves" Jibril's videos and asked, "maybe I can study online with him?"  *Id.* ¶ 61.  On June 8 and June 9, 2022, Nasr twice asked a fourth Instagram user ("Instagram User-4") about how he (Nasr) could study with Jibril.  *Id.* ¶ 63.

### C.  Nasr Decides to Wage Jihad With Al Shabaab

Days after October 7, 2023, when Hamas fighters flooded Israeli communities to murder and kidnap more than 1,000 victims, including hundreds of women and children, Nasr began inquiring about traveling to join a terrorist group.  PSR ¶ 64.  For instance, on October 10, 2023, Nasr asked a user on X ("X User-1") if he could move to Afghanistan and join the Taliban.  In the same conversation, Nasr stated that he wanted to become a mujahid (*i.e.*, a fighter for Islam) in Afghanistan, Syria, Somalia, or Palestine.  *Id.*  Nasr also discussed with X User-1 during that conversation the safest routes to travel to Pakistan and mentioned an Afghan sheikh he knew in America who had advised Nasr that he could fly from Dubai to Kabul, Afghanistan.  Nasr noted, however, that he (Nasr) did not think it was safe to travel to Afghanistan from Dubai; he believed that it was safer to fly from Turkey to Afghanistan or to travel to Pakistan and then cross by land from there into Afghanistan.  *Id.*  As set forth in greater detail below, Nasr later described that it

---

[1] *See* https://www.counterextremism.com/extremists/ahmad-musa-jibril.

was Hamas' attack that motivated him to attempt to personally join the violent ranks of the jihadist cause.

On November 5, 2023, Nasr contacted two other users on X about making hijrah[2] to Somalia. *Id.* at 65. In a message to one of those users of X ("X User-2"), Nasr asked X User-2 if he was in Somalia, and then wrote, "I am interested in going to [S]omal[ia] to help the Muslims there." *Id.* In a message to the other user of X with whom Nasr communicated on November 5, 2023 ("X User-3"), Nasr wrote, "I saw your recent post about going to [S]omal[ia], I would like to go and wanted to connect with you to talk about it more. *Id.*

This conduct (among others) shows that Nasr aspired to travel for jihadist purposes, in particular to Somalia, well before he began messaging the CS on November 14, 2023. *Id.* ¶ 24. That goal is reflected in Nasr's earliest communications with the CS, when Nasr stated that he wanted to make "hijrah to Somalia, God-willing." *Id.* ¶ 25. And this was hardly an abstract goal: Nasr was clear in his intention to travel to become a terrorist. Nasr immediately explained to the CS, who Nasr thought was a facilitator for terrorist organizations, that he was physically capable of making hijrah and had skills to offer a terrorist organization. Specifically, Nasr explained that he was fit, had no medical conditions, and had started running to improve his cardio training prior to doing hijrah. *Id.* Nasr also explained that he could offer writing and translation skills to any terrorist group he joined. *Id.* Nasr told the CS that he wanted to learn to shoot with any group he joined, and he discussed ideas about how he could make hijrah without being detected. *Id.* For instance, Nasr suggested that he could pretend to be a tourist, and he also agreed that he could

---

[2] "Hijrah" (or "hijra") is an Arabic term normally used to refer to migration, but which is often used by those with extremist views to describe a foreign fighter's journey abroad to wage jihad. PSR ¶ 25, n.2.

pretend to work for a shipping company to provide a cover story for why he was traveling to Somalia. *Id.*

Two days later, on November 16, 2023, Nasr discussed his motivations for waging jihad and joining al Shabaab with the CS. Early in that conversation, Nasr confirmed to the CS that he was ready to make hijrah, wage jihad, and join al Shabaab. *Id.* ¶ 26. Nasr acknowledged that he was prepared to leave the comforts of Egypt and the United States, and to live under difficult conditions without his family. *Id.* He also explained that his motivation for waging jihad developed after he became more religious and realized how Islam solves the problems of the world; from his religious studies, Nasr explained that he learned that sharia (Islamic law) and khilafa (an Islamic state) were things to strive for. *Id.* During a discussion about the ideologies of various terrorist groups, Nasr explained that he believed that al Qaeda (which he viewed as including al Shabaab) had the best Islamic ideology at the time and that was why he wanted to join them. *Id.* ¶ 27. When discussing why he viewed other terrorist groups such as ISIS and the Islamic movements in Egypt unfavorably, Nasr explained that he disagreed with those groups' focus on fighting secularists. *Id.* ¶ 28. Nasr stated that "the secularists are not the number one enemy. The number one enemy is America. If we kill El-Sisi [the president of Egypt] now, another person who is a copy of him would replace him. We have to focus on the number one enemy, which is the head of the snake—which is America." *Id.*

Nasr viewed joining the mujahideen of al Shabaab as an opportunity to learn how to be a jihadi. He told the CS that after he finished his work with al Shabaab, he aspired to return to Egypt, where he foresaw "big events" in "coming years," and where he planned "to help the Muslims in Egypt in their struggle . . . ." *Id.* ¶ 29. Nasr wanted not only to fight, but to die in that fight, stating that "inshallah (*i.e.*, God willing) I would like to become a martyr in the sake of Allah." *Id.* Nasr

explained that after the October 7, 2023 attacks in Israel by the terrorist group Hamas, he "felt that something ha[d] changed.  To the better I mean."  *Id.*  Nasr "felt that pride and dignity came back to the Muslims."  *Id.*  He further explained that a lot of non-Muslim Americans were reading Usama bin Laden's Letter to America, which, according to Nasr, allowed them "to finally understand how evil America is."  *Id.*  The bin Laden letter Nasr cited with approbation described America as, *inter alia*, "the worst civilization witnessed by the history of mankind," citing as the first reason for that assertion that America, "rather than ruling by the Shariah of Allah in its Constitution and Laws, choose[s] to invent your own laws as you will and desire."[3]  The letter, published in 2002, soon after the al Qaeda attacks on America of September 11, 2001, ended by threatening America with "military defeat, political breakup, ideological downfall, and economic bankruptcy."  *Id.*

Later in the day on November 16, 2023, Nasr told the CS that he intended to travel to Somalia to join al Shabaab in jihad.   PSR ¶ 36.

The next day, November 17, 2023, Nasr sent the CS a voice note in which he stated:

> I have been thinking about this for a long time. As I have said, I was not capable of doing it.  But when the operation, Flood the Aqsa [a reference to the October 7, 2023, Hamas attack on Israel] started, I felt something has changed in the world.  I felt something is different in the world.  It gave me a little push to make hijrah.  One more thing, I saw the video of the Zionist bombing the hospital al-Ahli in Gaza.  I know that they brought this bomb from America.  Wallahi [meaning I swear to God] from the moment I saw the video, I said I would never come back to America inshallah (*i.e.*, God willing).

*Id.*  ¶ 33.  Nasr also told the CS that his decision to make hijrah had been made after reading al Qaeda's Inspire magazine, which he had obtained online.  *Id.*  ¶ 34.

---

[3]  *See* https://web.archive.org/web/20040615081002/http://observer.guardian.co.uk/worldview/story/0,11581,845725,00.html.

On November 19, 2023, Nasr told the CS that going to Somalia to join al Shabaab would be a good experience for him because he could "get training [in a camp] and experience there, and after they take Somalia, [he] could go to Mali or Yemen." *Id.* ¶ 38.[4] Nasr explained that he wanted to join al Shabaab in Somalia "to please Allah and bring victory to the Muslims," and that he understood that making hijrah was a commitment. *Id.*

### D. Nasr Plans to Travel, and Travels to Kenya to Join Al Shabaab

By the end of November 2023, Nasr was making concrete plans to join al Shabaab by traveling to Kenya, where he hoped to transit into neighboring Somalia. As detailed above, Nasr had thought about waging jihad for a "long time," even before the Hamas terrorist attacks of October 7, 2023, and he spent weeks planning and executing his plan to join al Shabaab, including taking several steps to avoid detection by law enforcement.

Nasr sought the CS's assistance to connect him with al Shabaab. On November 19, 2023, the CS told Nasr that once he arrived in Kenya, al Shabaab would transport Nasr to the al Shabaab training camp in Somalia. *Id.* ¶ 44. The next day, November 20, 2023, Nasr asked the CS about options other than Somalia and for advice about the most suitable option. *Id.* ¶ 39. In response, the CS reiterated that the decision whether to pursue hijrah and jihad was Nasr's decision to make. *Id.* Nasr asked for time to think about it, to which the CS responded that Nasr should take as long as he wanted to decide. *Id.* Nasr responded the very next day, November 21, 2023. Nasr wrote to the CS, "I've made my decision. I'm ready inshallah (*i.e.*, God willing) to go to Somal[ia]." *Id.* ¶ 40.

---

[4] In 2023, Mali and Yemen both experienced many terrorist attacks, including by Islamic extremist groups. *See* https://www.state.gov/reports/country-reports-on-terrorism-2023/mali/; https://www.state.gov/reports/country-reports-on-terrorism-2023/yemen.

Nasr promptly began preparing to wage jihad. By November 30, 2023, Nasr had booked a flight to Kenya from Cairo for January 11, 2024, along with a one-night stay in a hotel in Nairobi, Kenya. *Id.* ¶ 45. Nasr had also booked a reservation on a return flight from Kenya to New York. *Id.* As Nasr explained to the CS, the purpose of his return flight reservation was only to avoid law enforcement detection by creating the appearance that he was traveling to Kenya as a tourist. *Id.* ¶¶ 44-45. By the next day, December 1, 2023, Nasr had applied for a Kenyan visa, which was approved within a few days. *Id.* ¶¶ 46-47. Shortly thereafter, Nasr purchased military-style boots to bring to Somalia for use in al Shabaab's terrorist training camps. *Id.* ¶ 51.

Nasr also asked the CS whether he would be supplied with a gun and other supplies, or he would need to bring money to buy those items. *Id.* ¶ 43. When the CS told Nasr that he would be provided with equipment, Nasr asked whether he should bring money for anything else, and whether he could use a debit card or should carry the money in cash. *Id.* Nasr ensured he had enough funds for the trip. *Id.* ¶¶ 43, 45.

Nasr decided on his own to advance the date for his travel to Kenya. PSR ¶¶ 48-50. Specifically, Nasr sped up his plans to ensure that his mother would not disrupt his plot to wage jihad. *Id.* After learning that his mother was traveling to Egypt on December 15, 2023, in order to bring him back to the United States with her on December 29, 2023, Nasr decided that the solution to this "problem" was to expedite the date of his travel to Kenya—moving his flight up by nearly a month, to December 14, 2023, instead of his original planned January 11, 2024 departure. *Id.* ¶¶ 48, 50. Nasr planned to stay in an apartment in Nairobi (and even identified an apartment listing there) while he waited for the al Shabaab "Brothers" to meet with him. *Id.* ¶ 48. Nasr explained to the CS that his mother did not know that he was planning to make hijrah, and she wanted to take him back to America because "parents nowadays have no interest in religion,

and they do not want their children to be mujahideen." *Id.* ¶ 49.  Nasr believed that his mother wanted him to return to America to continue his education and to work.  *Id.*

The day before his trip, Nasr told the CS that he hoped to obtain "regular military training" from al Shabaab, but was prepared to do whatever the "Brothers" wanted him to do.  *Id.* ¶ 51.

Nasr took several steps of his own devising to avoid detection by law enforcement.  It was Nasr who came up with the cover story of pretending to be a tourist when traveling to Kenya.  *Id.* ¶ 41.  Nasr also came up with the idea to book a return ticket from Kenya to New York instead of a one-way ticket to Kenya, and to wear a suit when traveling to avoid suspicion.  *Id.* ¶¶ 44-45.  In addition, Nasr expressed to the CS his concerns about the relative safety from law enforcement detection on different routes to join al Shabaab, suggesting that it would be safer to travel to Kenya from Egypt or Turkey than from the United States.  *Id.* ¶ 42.

Further proof of his desire to remain undetected and not be stopped from joining al Shabaab, Nasr asked the CS whether he should buy a SIM card for his phone to avoid law enforcement tracking his location.  *Id.* ¶ 46.  Nasr told the CS that he had shaved most of his beard to avoid looking suspicious, and he also sent to the CS responses he planned to provide to Kenyan immigration authorities to conceal the true purpose of his visit.  *Id.* ¶¶ 50-51.  And to ensure that there would be no evidence for law enforcement to use if he were detained, Nasr planned to delete data from his laptop and cellphone prior to traveling to Kenya.  *Id.* ¶ 50.

### E.  Nasr's Social Media Posts Demonstrate His Radicalization

The text exchanges described above are not the only evidence of Nasr's contempt for America, his adoption of a jihadist ideology, and the tremendous danger he would continue to pose if released from custody.  As Nasr planned to become a terrorist himself, Nasr also made his intentions known on social media.  For example, on or about October 20, 2023, before he met the

CS, Nasr reposted an al Qaeda propaganda video glorifying jihadist ideology and action, a screen shot of which is below. PSR ¶ 32.



The al Farooq training camp referenced above was one of al Qaeda's key training sites in Afghanistan leading up to the attacks of September 11, 2001. *See, e.g.*, *United States v. Ghailani*, 761 F. Supp. 2d 167, 172 & nn. 17, 18, 19, 21 (S.D.N.Y. 2011), *aff'd*, 733 F.3d 29 (2d Cir. 2013).

On the same day that Nasr booked his original flight to Kenya to join al Shabaab, November 30, 2023, Nasr threatened in a social media post that "Jihad on your home turf" was "[c]oming soon to a US location near you," followed by airplane, bomb, and fire emojis as shown

below, thereby conveying clearly a threat of violent jihad in the United States. *Id.*



That same day, as he committed to jihad, Nasr threatened America with humiliation and aligned himself with those terrorists who would use "IEDs [improvised explosive devices] and small arms" to "humiliate" this country.   While Nasr did not name America, his references to "your humiliations in Mogadishu, Benghazi, and Kabul," all cities in which American lives were notoriously lost in terror attacks, makes clear that the "you" he is referencing, are Americans.  *Id.*



In another expression of his violent hostility towards the United States and American freedoms, on December 12, 2023, two days before flying to Kenya to join al Shabaab, Nasr responded to a post announcing the birth of a gay couple's sons via surrogate by invoking al

Qaeda's September 11, 2001 attacks on New York City, writing: "And this is why we fly jets into skyscrapers." *Id.* In doing so, Nasr both identified himself with ("we") and attempted to justify the September 11, 2001 al Qaeda attacks:



Nasr exposed his adoption of jihadist ideology and his desire to harm the United States in even more social media posts, to include his "liking" posts threatening the death of Americans and glorifying terrorist attacks. For example, on or about November 20, 2023, Nasr liked a post that showed two planes flying toward One World Trade Center, also known as the Freedom Tower, built on the site of the World Trade Center after it was destroyed during the September 11, 2001 attacks, which is depicted engulfed in flames. *Id.*



On the same day, November 20, 2023, Nasr also liked the following posts, which compared Usama bin Laden to Jesus Christ and asserted that jihad is "very needed today."  *Id.*





Notably, Nasr made all of these November 20, 2023 posts, embracing bin Laden and celebrating the threat of continued terrorist attacks on New York City, just *one day* after he told the CS that

going to Somalia to join al Shabaab would be a good experience for him because he "could get training [in a camp] and experience there, and after they take Somalia, [he] could go to Mali or Yemen" to continue to fight for al Shabaab across multiple countries. *Id.* ¶ 38.

And on December 10, 2023, mere days before he flew to Kenya to try to join al Shabaab, Nasr liked the following post that explicitly called for the murder of all Americans who support Israel "wherever they are on this planet." Exhibit A at USAO_000432 (a selection of Nasr's social media posts, including those referenced in the PSR).



In short, through his media posts, Nasr left no doubt about his deep commitment to violent, jihadi attacks on the United States and Americans, both in the United States and elsewhere, and that he sought to support and join those who conducted such attacks, including Usama bin Laden, who, as Nasr undoubtedly knew given his immersion in the jihadi world, was responsible for the deaths of thousands of American civilians in his own community.

## II.   Nasr's Arrest, Post-Arrest Statements, Charges, and Guilty Plea

### A.  Nasr's Arrest in Kenya

On or about December 14, 2023, Nasr flew to Kenya. PSR ¶ 52. When he arrived in Nairobi, Nasr was interviewed by Kenyan immigration officials. During that interview, Nasr deployed the false cover story he had previewed to the CS. Nasr falsely told Kenyan immigration

officials that he had traveled to Kenya for tourism purposes, and that he intended to visit the Giraffe Center, Massai Mar, and the Nairobi Park. *Id.* ¶ 41; Exhibit B (various Kenyan law enforcement documents, including a memorandum of Nasr's interview with Kenyan authorities). After entering Kenya, Nasr traveled to the hotel that he had booked online and was later arrested there by Kenyan authorities. PSR ¶ 45; Exhibit B.

When Nasr was arrested by the Kenyan authorities, he was found in possession of multiple copies of important documents such as multiple copies of birth certificates for himself and his family members, three copies of his New Jersey driver's license, an Egyptian identification document, his health insurance card, and a debit card, among other things. Exhibit B at USAO_2422, USAO_2435 (inventory of items seized from Nasr by Kenyan law enforcement authorities and copies of his identification). Nasr was also found in possession of the military-style boots that he had told the CS he had purchased in order to use in al Shabaab's terrorist training camps. PSR ¶ 51.

### B. Nasr is Charged by Complaint

On December 14, 2024, immediately after his arrival in Kenya, Nasr was charged by a criminal complaint in this District with attempted provision of material support and resources to a designated foreign terrorist organization, namely al Shabaab, in violation of 18 U.S.C. §§ 2339B, 3238, and 2. *United States v. Nasr*, (S.D.N.Y. Dec. 14, 2023), Dkt. No. 1. Kenyan authorities ultimately transferred Nasr into U.S. custody, to face the present charges.

### C. Nasr's Post-Arrest Statements

FBI agents took custody of Nasr on or about December 28, 2023, and brought Nasr from Kenya to the Southern District of New York to face these criminal charges. In transit, Nasr waived his *Miranda* rights and agreed to speak with U.S. law enforcement officers. PSR ¶ 54. Rather than recanting his radical jihadist views, Nasr, during the interview, instead reaffirmed his long-

held commitment to waging violent jihad against America. *Id.* Specifically, Nasr stated, among other things, that the members of al Shabaab were "freedom fighters" and that his role models were the "mujahideen" in Afghanistan. *Id.* Nasr explained that he was driven to action—meaning to fight—by Hamas's October 7, 2023 attack on Israel. *Id.* Nasr reiterated to the agents that he had to fight against what he called the "number one enemy" of Muslims—America. *Id.* Nasr asserted that his decision to join al Shabaab was morally justified because "his people," *i.e.*, Muslims, were being "slaughtered." *Id.* Nasr said that he believed that America was "evil" and the "head of the snake" and was responsible for purportedly allowing Israel to destroy Gaza. *Id.* Finally, Nasr told the FBI agents that they should have let him die because he was not afraid of dying for the jihadist cause, but he was afraid of prison life. *Id.*

Nasr also told the FBI during his post-arrest interview, that he spoke to his mother while in Kenyan custody, and during that call he provided his mother with the password for his Twitter (X) account. *Id.* ¶ 52. A few days after his arrest, Nasr's Twitter account was deactivated by someone at the IP address assigned to his mother's home. *Id.* The deactivation of Nasr's Twitter account led to the permanent deletion of some of the content from Nasr's Twitter account. *See* USAO_002257-58 (Records from X, noting that that Nasr's account had been deactivated and the requested data was not available).[5] As set forth above, the Twitter records that law enforcement did preserve and capture from Nasr's account are replete with invocations of al Qaeda, terrorist attacks like September 11, 2001, and other threatening images and statements targeting Americans. *See, e.g., supra* ¶ I.B (describing December 12, 2023 post by Nasr, two days before he traveled to join al Shabaab, stating "And this is why we fly jets into skyscrapers.").

---

[5] These materials were produced to Nasr in discovery. The Government is prepared to provide to the Court a copy upon request.

### D.  The Indictment and Guilty Plea

On January 11, 2024, a grand jury in this District returned a one-count Indictment charging Nasr with the same offense as charged in the Complaint.  *United States v. Nasr*, Dkt. No. 6., (S.D.N.Y. Dec. 14, 2023). Just over a year later, on January 27, 2025, Nasr pled guilty, without a plea agreement, to Count One of the Indictment. PSR ¶ 4.  During the plea proceeding, Nasr admitted, among other things, that he traveled from Egypt to Kenya to meet with people he believed were members of al Shabab in order to work under them and confirmed that he knew at the time of his offense that al Shabaab was engaged in terrorist activity, including the unlawful use of weapons with the intent to endanger the safety of others.  Plea Tr., Dkt. 52, at 18.  Nasr also confirmed that he knew his conduct was wrong and illegal.  *Id.*

### E.  The Presentence Report

The United States Probation Office (the "Probation Office") recommends that the Court impose a far below Guidelines sentence of 8 years' imprisonment followed by 10 years of supervised release, after considering Nasr's age, mental health and cited neurodevelopmental conditions, and absence of commission of violent acts or identifiable victims.  Presentence Investigation Report, revised May 5, 2025 ("PSR"), Dkt. 57, at 48.  In formulating its recommendation, the Probation Office observed: "[T]errorism represents a particularly grave threat because of the dangerousness of the crime, the difficulty in deterring and rehabilitating the offender, and the greater than usual reason to fear recidivism.  If not interrupted in progress, these offenses have the capacity to lead to unspeakable horror.  Nasr went beyond expressing his radical views online and sharing a few inflammatory tweets.  He formulated a very specific plan and successfully traveled to Kenya where he expected to meet with actual terrorists."  PSR at 47.

For the reasons set forth below, the Government respectfully, but strongly, disagrees with Probation's recommendation in this case.  Such extreme leniency is not warranted in this case and

would fail to meet the legitimate purposes of sentencing, including the need to protect the public.

## **DISCUSSION**

### I.    **Applicable Law**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50).

22

## II.    The Undisputed Guidelines Sentence Is 20 Years' Imprisonment

It is undisputed that the Guidelines call for a sentence of 20 year' imprisonment for Nasr.

As set forth in the PSR, the Guidelines offense level is calculated as follows:

- The Guideline that applies to a violation of 18 U.S.C. § 2339B is U.S.S.G. § 2M5.3, which yields a base offense level for Count One of 26. PSR ¶ 75.

- Pursuant to U.S.S.G. § 2M5.3 (b)(l)(E), because the offense involved the provision of material support to al Shabaab, a known terrorist organization, with knowledge that the assistance would be used to commit or assist in the commission of a violent act, two levels are added. *Id.* ¶ 76.

- Pursuant to U.S.S.G. § 3A1.4(a), because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, 12 levels are added. *Id.* ¶ 77. The adjusted offense level for Count One therefore is 40. *Id.* ¶ 80.

- Assuming the defendant continues to demonstrate acceptance of responsibility prior to the imposition of sentence, *see* U.S.S.G. § 3E1.1(a), and because he timely notified authorities of his intention to plead guilty, *see id.* § 3E1.1(b), the offense level is decreased by three levels. *Id.* ¶¶ 82-83.

- Accordingly, the total offense level is 37. *Id.* ¶ 84.

Nasr has no known criminal convictions. *Id.* ¶ 87. However, because his offense involved a federal crime of terrorism, the applicable criminal history category ("CHC") is VI, pursuant to U.S.S.G. § 3A1.4(b). *Id.* ¶ 89. A total offense level of 37 and a CHC of VI result in a Guidelines range of 360 months to life imprisonment. *Id.* ¶ 89. However, because the statutorily authorized maximum sentence for Count One is 240 months' imprisonment, the applicable Guidelines range—or, in this case, Guidelines sentence—is capped at 240 months', or 20 years', imprisonment. *Id.* ¶ 127. Nasr is also subject to a maximum term of supervised relief of life. *Id.* ¶ 129.

### A.  Application of the Terrorism Enhancement is Appropriate

The defendant contends that the "terrorism enhancement" under U.S.S.G. § 3A1.4 does not merit the Court's deference, and therefore the Guidelines calculation in this case should be given

little weight by the Court.    (Def. Ltr. at 13).    Specifically, Nasr argues that the terrorism enhancement produces "irrationally long recommended sentences for first time offenders who did not actually hurt, intend to hurt, or come close to hurting anyone" because it doesn't account for the defendant's specific offense conduct or their actual criminal history or personal characteristics. *Id.*

As an initial matter, the defendant does not claim that the enhancement, by its terms, does not apply in this case, which it plainly does.  *See* U.S.S.G. § 3A1.4(a); 18 U.S.C. § 2332b(g)(5). Instead, he advances arguments amounting to little more than his claim that the enhancement sweeps too broadly and punishes too harshly.  But as discussed below, courts in this Circuit (and the Second Circuit Court of Appeals) have repeatedly upheld the application of the enhancement in terrorism cases, rejecting precisely these sorts of arguments.

In 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinarily serious nature of their conduct.  *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting terrorism enhancement at U.S.S.G. § 3A1.4(a) reflects Congress's judgment that defendants like Nasr who are convicted of terrorism offenses serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present. As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists *and their supporters* should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)); *accord United States v. Ceasar*, 10 F.4th 66, 79 (2d Cir. 2021).

The terrorism enhancement appropriately reflects the seriousness of the conduct in this case. As set forth above, Nasr considered waging jihad for years and was prompted to action by Hamas's October 7, 2023 terrorist attacks on Israel. Nasr made clear through his social media posts that he wished to "humiliate[]" the United States through violence, and that he identified himself among those who "fly jets into skyscrapers," including bin Laden. PSR ¶ 32. Intending to achieve his long-term goal of becoming a mujahid, Nasr flew from Egypt to Kenya to join al Shabaab—a brutally violent terrorist group responsible for the murders of many, including Americans. Nasr's communications show that this trip was, for him, a means to accomplish his jihadist aspirations. In his communications with the CS, Nasr made clear that he wanted military training from al Shabaab and would also use his education to write and translate for them. He also told the CS that he was prepared to do whatever al Shabaab needed him to do, including to "kill and be killed." *Id.* ¶¶ 11, 51.

Providing material support and resources—in this case, services and personnel—to a foreign terrorist organization firmly committed to violence, including violence against Americans, is a terrorism offense of grave seriousness. And Nasr's particular skills and attributes made it especially dangerous, had he not been caught before acting on his terrorist desires. A native English speaker who can write and translate is a boon to the recruitment and propaganda efforts of a terrorist organization based in a non-English speaking country, such as al Shabaab. And a holder of an American passport, such as Nasr, can travel far more easily around the world than a holder of a Somali passport, including into the United States. Had Nasr accomplished his objective without detection, not only would he have provided material support to a very dangerous

organization, he also would have helped that organization to augment its recruitment and propaganda efforts, especially in English-speaking parts of the world such as the United States. And he would have permitted the organization to train a U.S.-passport holder, who could travel to most parts of the world with relative ease, and who would have a particularly easy time entering this country, including to carry out a terrorist attack. Nasr's skills and attributes, coupled with his firm belief that America was the "head of the snake" that must be attacked and commitment to violent jihad, make his attempt to provide material support to al Shabaab a crime of great seriousness. Nasr's conduct falls squarely within the class of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement.

Similarly, the enhancement's impact on Nasr's criminal history category is not irrational, as Nasr suggests. (Def. Ltr. at 13). Rather, the effect of the terrorism enhancement on the applicable Criminal History Category reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one in which the defendant is ideologically motivated—an assessment the Second Circuit has repeatedly and emphatically endorsed. The Second Circuit has "recognized that 'the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" *Stewart*, 590 F.3d at 143 (quoting *Meskini*, 319 F.3d at 92). That assessment is particularly appropriate here, where even after two weeks in a Kenyan jail, Nasr adhered to his radical jihadi views, including his commitment to fight the United States.

Contrary to Nasr's criticism that the enhancement does not differentiate between "attempting to provide material support to a terrorist organization (no matter how limited) [and]

26

actually perpetrating a violent terrorist attack resulting in death or injury," (Def. Ltr. at 13), the enhancement reflects Congress's deliberate judgment that the enhancement should apply regardless of whether a terrorist act results in death and destruction.  As the Second Circuit observed:

> We conclude by underscoring that the Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes. "[T]errorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission "plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences." Thus, in determining what constitutes a "sufficient" sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors.

*United States v. Mumuni Saleh*, 946 F.3d 97, 112-13 (2d Cir. 2019).

Simply put, application of the terrorism enhancement is correct, and a long line of cases in this District approving of and applying the enhancement firmly reinforces that conclusion.  *See United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y. Dec. 16, 2019), Dkt. 133 at 16 ("[T]he Second Circuit has, time and again, in its words expressly upheld the lawfulness of the terrorism enhancement.   And the Circuit has also specifically found that the Sentencing Commission had a rational basis in fashioning that guideline to increase both a defendant's offense level and his criminal history category.  It has reasoned to the latter that even terrorists with no criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.") (internal quotation marks and citations omitted); *United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y., May 12, 2021) (applying terrorism enhancement, and rejecting defense argument that it resulted in overstated offense level and

criminal history category, in case involving defendant who supported ISIS through disseminating propaganda online).

Citing *United States v. Kimbrough*, 552 U.S. 85, 109-10 (2007), as well as cases addressing the child pornography and fraud loss Guidelines, Nasr also challenges the process by which the Commission enacted the terrorism enhancement.  (Def. Ltr. at 14 & nn. 6-8).  While the Court has discretion to consider this as a basis for a variance, *Kimbrough* did not suggest that the Commission's "institutional role" and expertise was limited to enacting Guidelines based on empirical data.  Rather, the Court noted that the Commission's role also includes the ability to promulgate Guidelines based on "national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 552 U.S. at 109. Here,

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.  Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

*Meskini*, 319 F.3d at 92.  "Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases." *Id.*  (citing U.S.S.G. § 4A1.3) Accordingly, the terrorism enhancement is grounded in sound findings by Congress and the Sentencing Commission related to the relatively severe culpability and risks posed by terrorism offenders.  By its terms, the enhancement applies in this case and, as discussed in more detail below, the sentencing recommendation resulting from the application of the enhancement sets forth an appropriate sentence for the Court's consideration.

Finally, even if the "terrorism" enhancement could produce a debatable sentencing range in some hypothetical case, this is not that case. As discussed above, Nasr's conduct was particularly serious even though he was arrested before he could provide material support and he participated in no violence himself, and Nasr's adherence to his jihadist intent even after arrest and confinement abroad suggests that concerns about his recidivism based on his firmly held ideology are well placed here. Moreover, the Guidelines range resulting from the "terrorism" enhancement is capped in this case. Without the statutory maximum applicable here, Nasr would face a Guidelines range of 360 months to life imprisonment. PSR ¶ 127. But the statutory maximum brings the Guidelines sentence down to 240 months, *id.*, 33% lower than the bottom end of the otherwise applicable range.

In sum, application of the terrorism enhancement is entirely appropriate.

## III.    A Sentence of at Least 15 Years' Imprisonment Is Appropriate

Nasr's conduct in this case is so serious and dangerous, and the risk of recidivism so great, that a sentence of at least 15 years' imprisonment is necessary and appropriate to reflect the extremely serious nature of his offense, to provide just punishment for his conduct, to deter and prevent Nasr from resuming his activities in support of radical Islamic terrorist ideology, and to deter others who, like Nasr, seek to join, serve, and kill on behalf of brutal terrorist organizations like al Shabaab. In addition, the Government respectfully submits that a substantial term supervised release would be appropriate in light of the Nasr's age, Nasr's firmly held ideology and stated provocations (for example, the inspiration he felt upon seeing Hamas's October 7, 2023 terrorist attacks on Israel and the resulting war in Gaza), and his heightened risk for recidivism.

### A. A Sentence of at Least 15 Years' Imprisonment is Necessary to Protect the Public from Further Crimes by the Defendant

The need to protect the public from further crimes of the defendant, *see* 18 U.S.C. § 3553(a)(2)(C), is a paramount consideration here, and strongly supports the imposition of a sentence of at least 15 years' incarceration. Terrorism is a crime with high recidivism rates, and the rehabilitation of terrorism defendants like Nasr is notoriously difficult. *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorism defendants and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). Those factors are particularly applicable here.

Nasr's commitment to waging jihad and to a radical Islamic terrorist ideology was hardly a passing fancy. It developed over the course of years and, as noted above, was unshaken by Nasr's arrest and time in a Kenyan jail. Moreover, Nasr did not simply wish to help a terrorist organization spread its propaganda. Rather, Nasr was willing to do whatever al Shabaab needed him to do, including "kill or be killed"—he aspired to be a martyr for the cause. Furthermore, the target he wished to attack was not only in some distant country, it was also here—his home. Nasr's desire to attack the United States is evident from his social media posts, which called for attacks on American soil. For example, on the day he booked his first flight to Kenya, Nasr wrote "Jihad on your home turf. Coming soon to a US location near you with a plane, a bomb, and a fire emojis." PSR ¶ 32. Four days before flying to join al Shabaab, he also liked a post, which called for the death of every American who supports Israel. Exhibit A at USAO_00432. A couple days later, he wrote "And this is why we fly jets into skyscrapers," a reference to al Qaeda's September 11, 2001 terrorist attacks on the United States. PSR ¶ 32. During his interview with FBI agents, Nasr reiterated his willingness to die for the jihadist cause and claimed that he was "morally justified" to take action against the United States for causing the slaughter of Muslims. PSR ¶ 54.

For Nasr, America is evil, the "head of the snake," and the number one enemy of Muslims, and he finds inspiration in individuals such as Usama bin Laden and the violent al Qaeda-aligned terrorist organization al Shabaab, which regularly engages in acts of terrorism.  *Id.*  In addition, by his own account, Nasr "always struggled making friends and finding a place in [his] community" and even when he tried to do "'normal'" things like play basketball or start his own business, he "was rejected."  (Def. Ltr. Exh. B at 1).  Nasr found a like-minded community among jihadists, with whom he identified strongly.  There is substantial reason to believe he will go back to that jihadist community unless he is prevented from doing so by a substantial term of imprisonment.  The public's safety would be placed at an unacceptable degree of serious risk if he were released after less than three years' incarceration (assuming good time credit is applied).

### B. The Nature and Seriousness of Nasr's Conduct and the Need for Just Punishment Warrant a Substantial Sentence of Imprisonment

"[T]here is no danger to society greater than that of terrorism, no danger greater than that posed by those that think they can impose their will on others through senseless and incomprehensible violence."  *United States v. Raishani*, 17 Cr. 421 (RA), Dkt. No. 62 at 25-26, (S.D.N.Y. April 2, 2019).  And as this Court recognized when rejecting Nasr's bail application, "there is no disputing the seriousness of the charges against Nasr. . . . The Circuit has recognized the 'extraordinarily violent and sectarian nature of al-Shabaab's terrorism.'  The fact that Nasr was interdicted before he could reach the al Shabaab training camp does not negate his alleged intention to join the organization and the concrete steps he took in attempting to do so."  *United States v. Nasr*, No. 24 CR. 19 (AT), 2024 WL 3102178, at *2 (S.D.N.Y. June 24, 2024) (quoting *United States v. Jones*, 100 F.4th 103, 112 (2d Cir. 2024)).  Of course, Nasr's intention to join al Shabaab is no longer "alleged"; it has been proven.  And as discussed above, so too has the fact that Nasr was among those who thought they could impose their will on others through violence.  He aspired

31

to wage jihad against the United States by supporting al Shabaab's violent mission in any way he could, including by killing others, risking being killed himself, writing, translating, and sharing al Shabaab's message.  Thus, Nasr's crime was extremely serious and dangerous, especially to Americans and American interest and allies.  A sentence of no less than 15 years' imprisonment is therefore needed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A).

### C.  A Substantial Sentence Is Necessary To Afford Adequate Deterrence and To Promote Respect for the Law

A substantial sentence is also necessary in order to adequately deter criminal conduct—in this case, terrorism aimed at harming Americans and American interests—and to promote respect for the law prohibiting such destructive conduct.  *See* 18 U.S.C. § 3553(a)(2)(A)-(B).  As Judge Walker observed in his concurrence in *Stewart*, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." *Stewart*, 590 F.3d at 181.

The capacity of a terrorist organization like al Shabaab to thrive hinges in large part on its ability to grow its membership—to attract, indoctrinate, and enlist new followers, like Nasr, who are committed to advancing and serving al Shabaab's murderous agenda or die trying.  It is only through this support that al Shabaab and other terrorist groups are able to fulfill their missions of hate, murder, and violence.  Deterring such conduct is particularly important in today's environment, given that many young people in the West, including in the United States, have become radicalized by jihadist propaganda online, and have either traveled or tried to travel abroad to join terrorist groups or have conducted or tried to conduct attacks at home in the West.  It is vital for our country's national security that other young people, when exposed to hateful extremist teaching, be deterred from choosing to follow a path similar to Nasr's and engaging in potentially

devastating conduct in support of such groups. It is important for those contemplating joining a terrorist organization to know that the consequences for such conduct are serious and include spending a significant portion of their lives in prison. And it is important for the public, including relatives watching for signs of indoctrination in their loved ones, to know that those who seek to join and support terrorist organizations will face serious punishment in order to prevent them from causing harm to society. A sentence at least 15 years' imprisonment is necessary to serve the pressing need for general deterrence of such terrorism offenses.

Nasr also argues that a sentence greater than three years' imprisonment would not promote the goals of either general or specific deterrence. (Def. Ltr. at 21). But he is mistaken. A substantial sentence is necessary to deter others from engaging in similar conduct. Nasr engaged with a jihadist community online that keeps apprised of terrorism prosecutions. Indeed, shortly after news reports of Nasr's arrest broke, those articles were shared and reposted on X by those in his community and discussed. *See* Exhibit C (social media posts discussing Nasr's arrest). Some of the posts were viewed over a thousand times. Unlike some other crimes where the deterrent effect is difficult to identify, here it is apparent. The community of jihadists connect with each other and consume content online—they are a rapt audience. They are attentive to Nasr's prosecution, and thus, it is critical that the Court impose a sentence that is commensurate with the seriousness of the crime and the danger that the defendant poses, and let other jihadist and supporters know that those who wish to harm Americans or American interests will be punished significantly for that conduct. A three-year sentence will have little or no deterrent effect to the members of this community who often hold deep convictions about their jihadist ideology— indeed, it would send the opposite message to other aspiring terrorists. In short, the sentence here must be significant to deter others from engaging in jihadist conduct.

**D. Nasr's Personal Circumstances Do Not Support a Sentence of Less Than 15 Years' Imprisonment**

Nasr argues that his age at the time of his criminal conduct, the psychosocial stressors to which he was subject, and his mental health struggles justify a dramatic downward variance. (Def. Ltr. 16-20). All these factors, he argues, left him "highly vulnerable to negative influences and susceptible to fantastical thinking about finding purpose and meaning in this life by joining a militant group and defending besieged Muslim people." (Def. Ltr. 20). The defense's characterization of Nasr's personal circumstances, however, is refuted by the facts of his criminal conduct, including the clearly premeditated and sophisticated nature of Nasr's actions.

Nasr's age and the psychological factors he relies on plainly did not interfere with his ability to commit his crime and function in the world as was necessary for him to do so. Nasr was able to travel from the United States to Egypt and live there by himself. While in Egypt, he was able to make, on his own, all the arrangements to attempt to join al Shabaab, including obtaining a Kenyan visa and booking a flight and a hotel room. Nasr was also able to devise and implement measures to hide himself and evidence of his crime. Nasr made a return flight reservation to the United States, shaved most of his beard, and planned to wear a suit, all to avoid raising alarms with law enforcement. He contrived a cover story of pretending to be a tourist and prepared and delivered false answers during his interview with Kenyan immigration authorities in order to deceive them about his terrorist plans. Nasr also had the foresight and ability to change the SIM card in his phone to avoid law enforcement tracking his location and to delete data from his laptop and phone so that data would be unavailable to law enforcement if he were detained. When Nasr learned that his mother was coming to Egypt to bring him back to the United States, he was able, on short notice, to expedite the timing of his plot to join al Shabaab precisely in order to evade his own family's care and concern. And even after he was arrested in a foreign country, he was able

to convey his social media password to his mother in an additional effort to hide evidence of his crime and attempt to delete his incriminating social media posts lauding al Qaeda and threatening jihadist violence on American soil. Similarly, he had installed and used Proton VPN (Virtual Private Network) on his computer, a software application which allows users to browse the web without detection. In other words, Nasr's attention to and focus on joining al Shabaab and deleting or obscuring evidence of his crime was sophisticated and acute, demonstrating a frighteningly high level of cognitive and operational capabilities. Nasr deployed those sophisticated capabilities to one end: joining a brutal foreign terrorist organization.

Nasr's work history and education also demonstrate that he is a functional and competent person. He was regularly employed from 2020 to 2023 while attending school. Nasr earned 57 college credits and had a cumulative GPA of 3.13. PSR ¶ 112. He worked at Best Buy from 2022 until 2023, where he assisted with device installations. *Id.* ¶ 116. In 2022, he attempted to start his own freelance copywriting and sales business. *Id.* ¶ 117. Nasr also started a podcast (which remains available on Apple), where he interviewed the CEOs of five supplement brands. *See* USAO_00450-454.[6] In 2021, he worked at a Dunkin Donuts; in 2020 he worked as a delivery driver; and from 2015 to 2016, while in high school, he worked as a basketball instructor at the YMCA. PSR ¶¶ 118-120. Nasr attempts to portray himself as naïve and unsophisticated. (Def. Ltr. at 9). But the undisputed facts demonstrate that Nasr was a young adult, with some challenges, who nonetheless lived a functional and sophisticated life, including by living abroad independently from his family, notwithstanding his reported psychological and neurodevelopmental conditions from his youth. Nasr was a young man with opportunity and familial support, who became an aspiring violent terrorist because he purposely and intentionally chose to do so.

---

[6] *See also*, https://podcasts.apple.com/us/podcast/the-supp-bros/id1646726397.

Nasr's reported psychological and neurodevelopmental conditions, rather than preventing him from functioning in the world, seem to have made it difficult for him to find an emotional home in the world. As he says, he has "always struggled making friends and finding a place in my community." (Def. Ltr. Ex. B at 1). Similarly, counsel reports that Nasr "has long been isolated from his peers, yearned for a sense of community, and been vulnerable to online charlatans and their illusory promises." (*Id.* at 2). So, Nasr "desperately searched for community, inspiration, and validation from the internet . . . ." (Def. Let. 6). And as this case makes clear, Nasr found what he was looking for in the online jihadi community and wished to find an even greater degree of "community, inspiration, and validation" of himself and his worldview by joining a jihadi group. Thus, there is substantial reason to doubt that a path Nasr has chosen and abandoned before, such as college, or a job working as a research assistant for a history professor, which is identified in Nasr's reentry plan as a professional goal, (Def. Ltr., Ex. K at 4), will provide sufficient community, inspiration, and validation for Nasr, given how long and how firmly he espoused the jihadi worldview, and given the likelihood that violent conflict in the Middle East, which Nasr said motivated him to seek to join a terrorist group, will recur.

The Second Circuit has recognized that mental illness issues can sometimes "cut both ways," and that one of those ways is that they may create a greater risk to the community and necessitate a longer sentence to protect the community. *United States v. Lutchman*, 910 F.3d 33, 40 (2d Cir. 2018) (internal quotation marks omitted). The Second Circuit has also recognized that even mitigating psychological disorders can be outweighed by other factors in fashioning a sentence. *E.g., United States v. Mora-Pestana*, 496 F. App'x 98, 100 (2d Cir. 2012). Consistent with that authority, Judge Abrams of this District sentenced to 15 years in prison a defendant convicted of the same crime as Nasr even though that defendant suffered from severe mental health

issues that led to him having been hospitalized more than 20 times.  *United States v. Encarnacion*, 19 Cr. 118 (RA) (S.D.N.Y. Aug. 11, 2020), Dkt. 88 at 29, 32.  As she did so, Judge Abrams noted that "[a]t the end of the day, while I have of course considered all of the 3553(a) factors . . . I think incapacitation is perhaps the most important factor at play here."  *Id.* at 31.  Here, Nasr's struggles to find community may well lead him back to the community he found in the jihadi world.  The purposes of sentencing, and especially the need to protect the public from further crimes of the defendant, preclude the downward variance sought by Nasr and require a substantial sentence of imprisonment of at least 15 years' imprisonment.

### E.  Prior Sentences Do Not Support the Variance Nasr Seeks

Nasr argues that "[a] sentence of 36 months' imprisonment would . . . be consistent with the sentences courts in this District and around the country have imposed on similarly situated defendants who engaged in much more culpable conduct than" Nasr, citing 18 U.S.C. § 3553(a)(6).  (Def. Ltr. 28).  This argument is inaccurate, meritless, and contrary to Circuit precedent.

As an initial matter, "the Sentencing Reform Act of 1984, whence the language in § 3553(a)(6) comes, was intended to 'eliminat[e] disparity on a *national* level.'"  *United States v. Fernandez*, 443 F.3d 19, 32 n.9 (2d Cir. 2006) (quoting *United States v. Tejeda*, 146 F.3d 84, 87 (2d Cir.1998)), *abrogated on other grounds* by *Rita v. United States*, 551 U.S. 338 (2007).  Throughout the United States, terrorism defendants who have attempted to travel, successfully traveled, or assisted other individuals in traveling to join foreign terrorist groups have frequently received substantial sentences, often the maximum term allowed by statute.  *See Stewart*, 590 F.3d at 166 n.4 (Walker, J., concurring in part and dissenting in part) ("In material support convictions after the Guidelines were deemed advisory in *United States v. Booker*, 543 U.S. 220, 245 (2005), district courts have generally imposed sentences of at least ten years per material support count, with considerably higher total sentences. . . .  Most of these courts chose the maximum material

support sentence available to them under federal law: fifteen years.").  As set forth in the PSR, in fiscal years 2019 through 2023, after excluding defendants who received departures pursuant to § 5K1.1 for providing substantial assistance to the Government, the average sentence of imprisonment imposed on defendants in cases in which § 2M5.3 applied was 184 months' imprisonment, and the median sentence imposed was 196 months' imprisonment.  PSR at 34.

Courts in this Circuit and this District generally adhere to this approach. As Judge Engelmayer has noted, the pattern of sentences in this District and the Eastern District of New York for material support cases "is consistent with the idea that this crime inherently requires a long sentence as a matter of just punishment. . . .  Of course, as with any offense, there are outliers in each direction but, in general, sentences for material support in cases yielding a 360-month-to-life guideline range have tended to cluster around the 15- to 20-year period."  *United States v. Bradley*, 21 Cr. 277 (PAE) (S.D.N.Y. February 2, 2023), Dkt. 112 at 63.

Moreover, the Second Circuit has disapproved of the more lenient approach advocated by Nasr.  In *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021), the defendant "expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas," who "then facilitated U.S.-based ISIS supporters' travel to ISIS-controlled territory."  *Id.* at 68.  The defendant "herself intended to travel to ISIS territory by way of Sweden, where she planned to marry another ISIS supporter."  *Id.*  However, the defendant was stopped by law enforcement at JFK Airport before she could achieve her goal.  *See id.*  The defendant ultimately pleaded guilty to one count of conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). *See id.* at 68-69.  The defendant's Guidelines range

was 360 to 600 months' imprisonment.  *See id.* at 69.  The court imposed a sentence of just 48 months' imprisonment, approximately 13% of the bottom of the Guidelines range.  *See id.*

On appeal, the Second Circuit vacated the sentence and remanded for resentencing.  *See id.* at 70.  The Second Circuit's decision was based on several grounds, one of which was that "in comparison with sentences for similar terrorism crimes, [the defendant's] sentence of 48 months' imprisonment was shockingly low and unsupportable as a matter of law."  *Id.*  In reaching that determination, the Second Circuit analogized to two other cases in which it had vacated a sentence and remanded for resentencing based on substantive unreasonableness: *Stewart*, 590 F.3d at 93, in which the defendant had a Guidelines range of 360 months' imprisonment but was sentenced to only 28 months' imprisonment; and *United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019), in which the defendant had a Guidelines range of 85 years' imprisonment, but was sentenced to only 17 years' imprisonment. *See Ceasar*, 10 F.4th at 80-82.

Additionally, the *Ceasar* court surveyed "the sentences imposed in a handful of recent material support cases," which "illustrate[d] the unwarranted disparity reflected by the 48-month sentence imposed" by the district court.  *See Ceasar*, 10 F.4th at 84.  Specifically, the court cited *United States v. Naji*, No. 16 Cr. 653 (FB) (E.D.N.Y. June 11, 2019), in which the defendant pleaded guilty to one count of attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, based on his posting of violent, pro-ISIS content on social media and his travel to Yemen to join ISIS, and was sentenced to the statutory maximum of 240 months' imprisonment. *See Ceasar*, 10 F.4th at 84-85.  The court also cited *United States v. Saidakhmetov*, No. 15 Cr. 95, 2018 WL 461516 (WFK) (E.D.N.Y. 2018), in which the defendants each pleaded guilty to one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, after one defendant was arrested at JFK Airport while attempting to travel to ISIS-controlled territory

through Turkey, and the other defendant was arrested at his apartment shortly before embarking on similar travel. *See Ceasar*, 10 F.4th at 85. The defendants were each sentenced to the statutory maximum of 180 months' imprisonment. These are yet two more cases that, along with the reasoning in *Ceasar*, support rejecting Nasr's request for a three-year sentence, and, instead, imposing a substantial sentence of imprisonment of at least 15 years.

Similarly, in *United States v. Raishani*, No. 17 Cr. 421 (RA), Dkt. No. 62, (S.D.N.Y, Apr. 2, 2019), defendant Adam Raishani—who had voiced support for ISIS for approximately two years—pleaded guilty to one count of attempting and one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 371. Raishani attempted to leave the United States to join ISIS but was stopped by law enforcement before he was able to do so. Raishani's Guidelines range was 360 months to life imprisonment, which, because of the statutory maximum, became 300 months' imprisonment. Judge Abrams sentenced Raishani to concurrent sentences of 240- and 60-months' imprisonment, the statutory maximum penalty on each count, explaining that "there is no danger to society greater than that of terrorism, no danger greater than that posed by those that think that they can impose their will on others through senseless and incomprehensible violence." *Id.*, Dkt. No. 62, Sent. Tr. 25-26. Judge Abrams explained that she imposed that sentence after surveying a wide array of cases and finding that many similar cases had imposed the statutory maximum, and that sometimes the sentence for a material support charge ran consecutive to another sentence. *Id.* at 27. Like Nasr, Raishani's "devotion" to a jihadist ideology was "not short lived." *Id.* at 28. Judge Abrams explained that the sentence she was imposing on Raishani was also based on the fact that Raishani had tried to assist ISIS for two years before he began speaking to the FBI confidential source, and she noted that even though Raishani

"never reached his destination and never actually fought for ISIS" it was "undoubtedly what he wanted to do." *Id.* at 28-29.

Likewise, in *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y. Dec. 6, 2019), Sajmir Alimehmeti pleaded guilty to one count of providing and attempting to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 2, and one count of making a false statement in a passport application to facilitate an act of international terrorism, in violation of 18 U.S.C. § 1542. Alimehmeti had radicalized, supported ISIS, and attempted to facilitate the travel of an undercover agent to join ISIS overseas. Alimehmeti's Guidelines range was 360 months to life imprisonment, which, because of the statutory maximum, became 360 to 540 months' imprisonment. Judge Engelmayer sentenced Alimehmeti to concurrent sentences of 20- and 22-years' imprisonment. *Id.*, Dkt. No. 133, Sent. Tr at 23, 110. In explaining his rationale for the sentence, Judge Engelmayer explained that the defendant's conduct was "extremely serious" even though that conduct "fell far short of planning an actual terrorist attack, either at home or abroad." *Id*. at 76-77. Alimehmeti's conduct included trying to aid an undercover agent's travel to Syria to join ISIS, lying on a passport application, stock piling military-styled equipment, including combat knives, and collecting ISIS propaganda. *Id.* at 77-79.

In *United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y. Nov. 28, 2007), defendant Rafiq Sabir was convicted, following a jury trial, of one count of attempting and one count of conspiring to provide material support to al Qaeda, by providing medical services to al Qaeda personnel. Sabir's Guidelines range was 360 months to life imprisonment, which, because of the statutory maximum, became 360 months' imprisonment. *Id.*, Dkt. No. 174. Judge Preska sentenced Sabir to 300 months' imprisonment. *Id.*, Dkt. No. 176.

41

Raishani, Alimehmeti, and Farhane are only a few examples of defendants who were sentenced to substantial terms of imprisonment for committing crimes similar in nature to Nasr's. Courts have routinely imposed sentences at or near the then-applicable[7] statutory maximum in numerous other cases involving defendants convicted of providing or attempting to provide material support to a foreign terrorist organization, by either attempting to travel or facilitating the travel of others to join such organizations. *See, e.g., United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y. May 12, 2021)) (defendant sentenced to statutory maximum of 20 years' imprisonment for disseminating large quantities of pro-ISIS propaganda and terrorist-attack training manuals in online chatrooms, participating and administering chatrooms, and exhorting other participants in chatrooms to commit lone-wolf attacks in United States); *United States v. Badawi*, et. al, No. 15 Cr. 60 (C.D. Cal. Oct. 19, 2016) (two defendants each sentenced to statutory maximum of 15 years' imprisonment for conspiring to provide material support to ISIS, where one defendant was arrested at airport attempting to travel overseas to join ISIS and the other defendant had supported and assisted his travel); *United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y. May 31, 2017) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Syria to join ISIS); *United States v. Alaa Sadeh*, No. 15 Cr. 558 (SDW) (D.N.J. May 10, 2016) (defendant sentenced to statutory maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y. Apr. 20, 2015) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join AQAP); *see also United States v. Kourani*, 6 F.4th 345, 357-

---

[7] In 2015, the maximum penalty for violating 18 U.S.C. § 2339B increased from 15 years' to 20 years' imprisonment. Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline over Monitoring Act of 2015, 114-23, June 2, 2015, 129 Stat 268 ("Section 2339B(a)(1) of title 18, United States Code, is amended by striking '15 years' and inserting '20 years'").

59 (2d Cir. 2021) (affirming district court's sentence of 40 years' imprisonment for defendant's conviction of various offenses, including providing and conspiring to provide material support to Hizballah, in part because sentence "simply reflects Congress' judgment as to the appropriate national policy for such crimes" (alterations and internal quotation marks omitted)).

The cases Nasr cites do not support his request for a 36-month sentence. First, not one of the sentences cited by Nasr is a 36-month (three-year) sentence. (Def. Ltr. 31 (*Bradley*, imposing a sentence of 11 years' imprisonment); 32 (*Muthana*, imposing a sentence of 9 years' imprisonment); 33 (*Bridges*, imposing a sentence of 14 years' imprisonment); 36 (*Hossain*, imposing a sentence of 8 years' imprisonment); 37 (*Ahmed* and *Yusuf*, imposing sentences of 11 years' and 9 years' imprisonment); 37 (*Natseh* and *Daniels*, imposing sentences of 5 years' and 6 years and 8 months' imprisonment).

Moreover, the reasons for a substantial sentence in this case are either as compelling or more compelling than in the cases to which Nasr cites. In *Bradley*, for example, Judge Engelmayer found that Bradley's conduct "considered alone would favor a sentence broadly consistent with . . . the range of 15 in to as high as 20 years." *United States v. Bradley*, 21 Cr. 277, Dkt. No. 112 at 63, (PAE) (S.D.N.Y. Feb. 2, 2023). But significant in Judge Engelmayer's decision to give a lower sentence was the fact that Bradley was 19 when he committed his crime, *id.* at 71, four years younger than when Nasr committed his crime. PSR at 3, ¶ 12. Judge Engelmayer also found compelling the deradicalization process that Bradley had undertaken with an organization called Parents for Peace, which involved 72 sessions of counseling, and which led Parents for Peace to conclude that Bradley had been deradicalized. *Bradley*, 21 Cr. 277, Dkt. No. 112 at 74. Nasr has undertaken no similar process. In addition, Bradley's incarceration coincided with "particularly harsh and rough prison conditions" just after the first year of the COVID pandemic, a factor that

led Judge Engelmayer to shorten his sentence by approximately two years, *id.* at 86-87. Nasr, on the other hand, was arrested and detained much later—in late 2023—after the period when COVID severely impacted the conditions at the MDC due to regular lockdowns, restrictions on movement and visits, as further discussed below. *See United States v. Muthana*, 21 Cr. 277, Dkt. No. 110, Sent. Tr. at 60 (PAE) (S.D.N.Y. February 3, 2023) (discussing COVID's impact on the conditions at the MDC). For all these reasons, the sentence Bradley received is not an appropriate model for the sentence Nasr should receive.

Similarly, there were factors at issue in *Muthana* that are not present in this case. For example, Judge Engelmayer concluded that Muthana's decision to join ISIS was a product of Muthana being "trapped in [her] parents' household," which he expected would never recur, thus diminishing the need for specific deterrence. *Id.* at 54. As discussed above, the same cannot be said of Nasr, because Nasr cannot be viewed as "trapped." He lived his life as he saw fit, including working as a delivery driver and moving to Egypt because that is what he wanted to do. Similarly, Judge Engelmayer found that Muthana had been the victim of physical and emotional abuse, which helped make her more prone to commit a terrorism offense, and, by the time of sentencing, that abuse was behind her. *Id.* at 54-55. Again, the same cannot be said of Nasr, who has not alleged any abuse and was a part of a loving and "supportive family." (Def. Ltr. Ex. B; *see also* Def. Ltr. Exs. C-I.) And, like Bradley, Muthana's incarceration coincided with particularly difficult prison conditions just after the first year of the COVID pandemic which reduced her sentence by about two years, 21 Cr. 277, Dkt. No. 110 at 60, while Nasr was detained much later. Thus, Muthana's sentence also is not an appropriate model for Nasr's sentence.

The case of *United States v. Cole Bridges*, 21 Cr. 65 (LJL) (S.D.N.Y. Oct. 14, 2022), also does not support Nasr's arguments for a three-year sentence. In explaining his reasons for

imposing a sentence of 14 years' imprisonment, Judge Liman noted that Bridges had an itinerant background growing up, was 20 years old at the time of the conduct, had recently gone through a psychological and identity crisis, and had no ISIS or jihadi contacts before joining the army. *Id.*, Dkt. 70 at 98, 100. Unlike Bridges, Nasr, despite his parent's divorce, enjoyed a relatively stable upbringing with a supportive family. Nasr was 23 years old—three years older than Bridges— when he attempted to join al Shabaab, and although he has a history of mental health and neurodevelopmental conditions, there is no evidence in the record that Nasr had recently undergone a mental health crisis. Critically, unlike Bridges, Nasr did have jihadi contacts, had been engaging in jihadist content online for more than two and half years before his arrest, and had considered becoming a jihadi for a "long time." Nasr's conduct did not occur during a moment of "great vulnerability." (*Id.* Tr. at 101; 106). Chillingly, Nasr was spurred to action after witnessing Hamas's depraved terrorist attacks on October 7, 2023. Where most saw chaos and terror in the murder and kidnappings of civilians and even children, Nasr felt inspiration to join in the ranks of jihadi terrorists. (*See supra* ¶ I.C (Nasr describing the influence of the October 7, 2023 attacks on himself and stating, "something has changed in the world. . . . It gave me a little push to make hijrah.").) Further, Nasr's conduct was sophisticated—he was able to obtain a visa, arrange his travel to join al Shabaab, travel internationally, and contrive and then convey his false cover story to dodge apprehension by foreign government officials. *Bridges* does not support Nasr's arguments for the dramatic variance that he seeks.

The 8-year sentence imposed by Judge Stein in *United States v. Hossain*, No. 19 Cr. 606 (SHS) (S.D.N.Y. Mar. 29, 2022), was an outlier, and, the Government respectfully submits, far too low. Hossain was convicted, following a jury trial, of one count of attempting to provide material support to the Taliban and one count of attempting to contribute funds, goods, or services

to the Taliban.  Hossain's Guidelines range was life imprisonment, which was capped at the statutory maximum sentence of 420 months' imprisonment.  The Probation Office recommended 300 months', or 25 years', imprisonment, and the Government sought a 420-month sentence.  Judge Stein imposed a sentence of 8 years' imprisonment based on what he characterized as Hossain's "unlikely and muddled and unrealistic" plan as well as various mitigating factors, noting "there were no victims or tangible injuries."  *Id.*, Dkt. No. 194, Tr. at 85.  The Government disagrees with this assessment and with the sentence imposed in Hossain's case, which should be heavily discounted and not serve as a guidepost for the sentencing calculus of this Court for Nasr.  Indeed, there was nothing "muddled or unrealistic" about Nasr's conduct.  He regularly communicated online with individuals in the jihadi community who had connections to terrorist organizations, and he traveled great distances to just outside of al Shabaab's territory.  But for law enforcement intervention, Nasr intended to meet al Shabaab members.  He also bought boots and made arrangements to wait in Kenya until he could meet with the individuals, he believed were members of al Shabaab.  When he was arrested, Nasr told FBI agents that they should have let him die because he was not afraid of dying for the jihadist cause – reaffirming the depth of Nasr's deadly commitment to terrorism.  PSR ¶ 54.  In light of these clear distinguishing factors and that, in the Government's view, Hossain's sentence was inappropriately low, *Hossain* does not serve as a model for Nasr's sentence.

None of the other cases that Nasr cites supports his request for a three-year sentence.  Indeed, some of the cases cited by Nasr reaffirm the Government's point, that a sentence far greater than the three years the defendant seeks is appropriate.   In *United States v. Ali Yasin Ahmed, Madhi Hashi, Mohamed Yusuf*, 12 Cr. 661, Dkt. Nos. 339, 343, 346, and 354 (JG) (E.D.N.Y.), the defendants were foreign nationals who traveled from Sweden and the United Kingdom to Somalia

to join al Shabaab where they fought and trained with al Shabaab. All three defendants were subject to removal from the United States, and yet Ahmed and Yusuf still each received sentences of 11 years' imprisonment, and their co-defendant Hashi received a 9-year sentence. In sentencing these defendants, then-Judge Gleeson highlighted how the particular defendants in that case were unusual and "complicated," because there was a "difference between someone with no anti-American animus joining al-Shabaab to participate in an internecine civil war," like Ahmed, Hashi, and Yusuf "as opposed to someone who joins al-Shabaab to participate in and has been demonstrated to participate in the kind of atrocious conduct . . . with that anti-American animus." *Hashi*, 12 Cr. 661, Dkt. 363 at 34, 37. Here, Nasr squarely falls into the latter, *more* culpable category distinguished from the "complicated" facts of Ahmed, Hashi, and Yusuf. By contrast, Nasr is an American citizen who traveled internationally to join al Shabaab in significant part because of his "anti-American animus" and clear terrorist aspirations: he viewed the United States as "evil" and the "head of the snake," and foreshadowed future terrorist attacks in the United States repeatedly during the course of his crime.

Nasr also relies on two cases from the Eastern District New York in which the defendants received, after an appeal, time-served sentences of 80-months' imprisonment, but those sentences resulted from factors completely inapplicable here. In *United States v. Al-Moayad*, 03 Cr. 1322, Dkt. No. 195, 235 (DLI) (E.D.N.Y.) and *United States v. Zayed*, 03 Cr. 1322 (DLI) (E.D.N.Y.), the defendants were convicted of conspiring to provide material support to al Qaeda and Hamas by agreeing to the facilitate the transfer of millions of dollars to support mujahidin with weapons. Al-Moayad was sentenced to six consecutive terms of 180 months imprisonment (the then statutory maximum) for a total of 900 months imprisonment. *Al-Moayad*, 03 Cr. 1322, Dkt. No. 197 at 2. Zayed, was sentenced to three consecutive terms of 180 months imprisonment for a total

of 540 months imprisonment. *Zayed*, 03 Cr. 1322, Dkt. No. 205 at 2.   After an appeal, the Second

Circuit vacated the convictions and remanded the cases for retrial on the basis of several

evidentiary rulings by the district court, finding that the admission of certain evidence was

improper and/or unduly prejudicial.  *United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008).

After remand, circumstances had dramatically changed.   Among other things, defendant Al

Moayad's health was "rapidly deteriorating," presenting the possibility that retrial would be

delayed "indefinitely." *Al-Moayad*, 03 Cr. 1322, Dkt. No. 235 at 1, 6.  Al Moayad's life expectancy

after the appeal was "estimated at a few months to a few years," and there was a significant

possibility that he would be too ill to stand trial at any time.  *Id.* at 6.  Moreover, retrial would have

presented "evidentiary challenges resulting from the Second Circuit's decision . . . ." *Id.* at 1.  For

these among other reasons, the Government and the defendants entered into plea agreements

pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that specified time-served sentences

of 80 months.  *Id.*  The defendants, who were not citizens or nationals of the United States, also

consented to their deportations from the United States.  *Al-Moayad*, 03 Cr. 1322, Dkt. Nos. 237,

241. These circumstances, of course, are completely inapplicable here.  Nasr is not facing death;

nor are there evidentiary obstacles to his conviction.  And Nasr is a native and citizen of the United

States, who is entitled to remain in this country after he is released from confinement.   The

sentences of Al-Moayad and Zayed are completely inapposite here.

Finally, Nasr relies on selectively a few out-of-Circuit cases, none of which involve a

sentence as low as the defense seeks here**.**  In sum, Nasr's request for a three-year sentence does

not comport with the sentences generally imposed in comparable cases, and utterly fails to account

for the gravity of his crime.

### D.    Nasr's Conditions of Confinement Do Not Justify a Variance

The conditions of Nasr's pretrial detention do not justify a variance. Nasr argues that the conditions of his pretrial confinement have imposed an additional significant punishment which weighs in favor of a variance.  (Def. Ltr. at 25).  While the Court can and should take these circumstances into account in fashioning an appropriate sentence, MDC conditions do not justify the variance Nasr seeks.  *See United States v. Mejias*, 24 Cr. 149, Dkt. No.  25, Sent. Tr. at 17-18, (LJL) (S.D.N.Y. Aug. 7, 2024) (expressing skepticism about the relevance of the conditions at the MDC to the incapacitation and public safety elements of the purposes of sentencing).  And while a number of courts in this District have previously found that the conditions at the MDC needed significant improvement, the MDC has over recent months taken serious steps to address those issues and has steadily improved conditions, increasing staffing levels and addressing persistent medical issues.

Indeed, Judge Furman, who approximately 18 months ago described the conditions at the MDC as "dreadful," recently recognized the MDC's much-improved conditions. *United States v. Chavez*, 22 Cr. 303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024).  More specifically, Judge Furman recently observed that "staffing is up to 75 percent, the medical services staff is significantly higher and fully staffed among nurses, the incidents of violence went from 42 in December . . . to only nine in April" (a 78% decrease in violence).  *United States. v. Reshard*, 24 Cr. 392, Dkt. No. 38, Sent. Tr. at 24, (JMF) (S.D.N.Y. May 14, 2025).  Other judges have also noted the improved conditions, including Judge Caproni who wrote that the "MDC is improving every day." *United States v. Villamizar*, 24 Mag. 4261, Dkt. No. 6, Tr. 15 (UA) (VEC), (S.D.N.Y. Dec. 10, 2024); *see also*, *United States. v. Alexander*, 24 Cr. 676, Dkt. No. 37, Tr. 125, (VEC) (S.D.N.Y.  Jan. 16, 2025) ("The horror stories from a year ago [at the MDC], it's not the [same] facility. They have a lot more staff. . . .  They're doing the best they can.").

Moreover, while Nasr complains about "prolonged lockdowns" among other issues, he was not incarcerated at the MDC in 2020, 2021, or 2022, at the height of the COVID-19 pandemic where there were more frequent lockdowns. And even when defendants were incarcerated at the height of the pandemic, courts have found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart*, No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g.*, *United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).

The reality is that, just like Nasr told the FBI in his post-arrest statement, Nasr seeks to avoid prison time for his crimes. Indeed, he would rather die as a jihadi martyr than serve time in prison. But the challenges of incarceration do not merit leniency for Nasr. For years, he praised bin Laden, identified with terrorist aims, and made threatening posts exposing his deadly ambitions. Nasr carefully plotted to abandon his life and family to pursue jihad and train to kill on behalf of a brutally violent terrorist organization. He lied and tried to destroy evidence of his crimes to avoid accountability. For this conduct, a substantial sentence of no less than 15 years of imprisonment is warranted, irrespective of Nasr's objections now to the conditions of his confinement.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence of at least 15 years' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Dated:          New York, New York
                June 23, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney


                              By:  _____/s/_____
                                        Camille L. Fletcher
                                        Kimberly J. Ravener
                                        Stephen Ritchin
                                        Assistant United States Attorneys
                                        (212) 637-2383 / 2358 / 2503